**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

DRIVER OPPORTUNITY PARTNERS I,
LP., a Delaware Limited Partnership
250 Park Avenue, 7th Floor
New York, NY 10177

       Plaintiff,

     v.

FIRST UNITED CORPORATION, a
Maryland corporation
     <u>Serve on</u>:
     William B. Grant, registered agent
     19 S. Second Street
     Oakland, MD 21550

     and

JOHN F. BARR, an individual
12404 Rocky Fountain Lane
Clear Spring, MD 21722-1763

     and

BRIAN R. BOAL, an individual
317 E Oak Street, # 1
Oakland, MD 21550

     and

M. KATHRYN BURKEY, an individual
120 S. Liberty Street
Cumberland, MD 21502

     and

SANU CHADHA, an individual
105 Marco Polo Drive
Morgantown, WV 26508

     and

CASE NO. _____1:21-cv-788_____

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

CHRISTY DIPIETRO, an individual
10 Chittenden Lane
Owings Mills, MD 21117

     and

JOHN W. McCULLOUGH, an individual
255 Tomar Drive
Oakland, MD 21550

     and

PATRICIA MILON, an individual
1406 Ingeborg Court
McLean, VA 22101

     and

CARISSA L. RODEHEAVER, an individual
1546 Orendorf Road
Accident, MD 21520

     and

GARY R. RUDDELL, an individual
One Corporate Drive
Grantsville, MD 21536

     and

I. ROBERT RUDY, an individual
115 S. Second Street
Oakland, MD 21550

     and

MARISA A. SHOCKLEY, an individual
3018 Old Annapolis Trail
Frederick, MD 21701

     and

H. ANDREW WALLS, III, an individual
915 Green Bag Road
Morgantown, WV 26508

       Defendants.

2

## COMPLAINT FOR
## DAMAGES AND INJUNCTIVE RELIEF

**NOW COMES** Plaintiff Driver Opportunity Partners I, LP ("Driver" or the "Fund") as and for its complaint against First United Corporation (the "Company" or "First United") and the individual members of the First United Board of Directors Messrs./Mses. Barr, Boal, Burkey, Chadha, DiPietro, McCullough, Milon, Rodeheaver, Ruddell, Rudy, Shockley, and Walls (the "Individual Defendants" or "Directors"; together the "Board")[1] avers as follows.

## NATURE OF THE ACTION

Driver is a minority shareholder in the publicly traded stock of First United (Nasdaq: FUNC), a Maryland bank holding company. On March 1, 2021, First United filed on behalf of its directors the Company's preliminary proxy statement (First United's "Preliminary Proxy Statement") to solicit votes for the upcoming annual meeting. First United's filing contains numerous false and misleading representations about the roles played by the Company and by individual directors instigating and influencing an investigation into Driver by the Maryland Commissioner of Financial Regulation ("Commissioner"), and about the current status of Driver's voting and nomination rights, all in violation of Section 14(a) of the Exchange Act. On March 26, 2021, First United filed a revised preliminary proxy statement ("Revised Proxy Statement") also in furtherance of its solicitation of votes for the annual meeting. The Revised Proxy Statement deletes a number of the false and misleading statements in the Preliminary Proxy Statement, but retains others. By this action, Driver seeks injunctive relief requiring First United to correct its Preliminary Proxy Statement, and award Driver the costs and disbursements of bringing this suit.

---

[1]   Defendants Chadha and DiPietro did not join the Board until January 2021, so references herein to the Board during periods prior to January 2021 are not intended to refer to Defendants Chadha and DiPietro.

**PARTIES**

1.      Plaintiff Driver Opportunity Partners I, LP is a Delaware limited partnership formed in April 2019 as an investment fund.  Since August 2019, Driver has been a beneficial owner of approximately 5.1% of the outstanding shares of FUNC common stock.[2]  Upon information and belief, Driver is one of the largest holders of FUNC common stock.

2.      Defendant First United is the parent of Maryland-chartered First United Bank & Trust, a depository institution based in Garrett County, Maryland. First United's common stock is registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is listed on the Nasdaq Stock Market.  First United Bank & Trust primarily operates in the markets of western Maryland and the surrounding regions of West Virginia.  As a bank holding company, First United is subject to regulatory oversight by the Commissioner, its primary state regulator.

3.      Defendants John F. Barr; Brian R. Boal; M. Kathryn Burkey; Sanu Chadha, Christy DiPietro, John W. McCullough; Patricia Milon, Carissa L. Rodeheaver; Gary R. Ruddell; I. Robert Rudy; Marisa A. Shockley; and H. Andrew Walls, III serve as members of First United's board of directors.  Directors Barr, Boal, Burkey, McCullough, Rodeheaver, Ruddell, Rudy, Shockley and Walls (the "Legacy Directors") were members of the Board during the formulation and implementation of the Disenfranchisement Plan (as defined below).  Upon information and belief, all named individual defendants except Chadha, Milon, and Walls are residents of Maryland. Upon information and belief, Milon is a resident of Virginia, and Chada and Walls are residents of West Virginia.

---

[2]      The general partner of Driver is a Delaware limited liability company with a name that also begins with "Driver," and for which non-party J. Abbott Cooper is managing member. When describing activities in March 2019 prior to formation of the fund, "Driver" thus refers to the activities of the general partner. Driver also has at times been referenced (mostly by First United representatives) with the pronoun "he," referring to Mr. Cooper in his capacity as managing member of Driver's general partner.

## RELATED LITIGATION

4. Driver, First United, and most of the Individual Defendants are parties to other actions pending in this Court.

5. In *First United Corporation v. Driver Opportunity Partners I LP*, No. 1:20-CV-2592-RDB (stayed) (the "FUNC lawsuit"), First United seeks to privately enforce a provision of Maryland law that authorizes the Commissioner to deny proposed acquisitions of controlling interests in Maryland banking institutions. Specifically, First United alleges in the FUNC lawsuit that Driver violated Section 3-314 of the Financial Institutions Article of the Maryland Annotated Code ("FI § 3-314") by not seeking pre-approval from the Commissioner before acquiring some portion of its FUNC holdings, and that as a result of such alleged violation, Driver should be prohibited for five years from voting its FUNC shares or nominating directors to stand for election to the First United board of directors.

6. In *Driver Opportunity Partners I LP v. First United Corporation*, No. 1:20-CV-2575-RDB (the "Driver 2020 Action"), Driver advances tort claims against First United and the Legacy Directors arising from conduct taken and statements made by them in 2019 and 2020. Currently pending is Driver's motion for leave to amend the complaint in the Driver 2020 Action for the purpose of bringing a claim under Section 14(a) of the Exchange Act related to statements made by First United (on behalf of the individual directors) in its 2020 Definitive Proxy Statement, filed April 17, 2020.

7. The present action advances a separate claim from those being litigated in the FUNC lawsuit or in the Driver 2020 Action, and relates to a subsequent disclosure. The instant claim arises under Section 14(a) of the Exchange Act, and relates to statements recently made by First United (on behalf of the Board) in its 2021 Preliminary Proxy Statement, filed March 1, 2021

(the Preliminary Proxy Statement), and Revised Preliminary Proxy Statement, filed March 26, 2021 (the Revised Proxy Statement).

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331.

9. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. This Court has jurisdiction over each named Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District. The transactions and wrongful acts that give rise to this complaint occurred in this District.

## FACTUAL BACKGROUND

### I.      Driver Calls For A Sale Of First United.

12. Driver invests in those publicly traded bank holding companies that it believes need an external catalyst to unlock shareholder value due to the conflicted interests of a board of directors. Specifically, Driver invests in publicly traded bank holding companies where it believes that sale value far surpasses standalone value and the primary impediment to a sale that would significantly increase the value for all shareholders is a board of directors with interests that are not aligned with shareholders.

13.     First United has a long record of underperformance relative to bank and general indices and a history of mismanagement that damaged shareholder value.

14.     Based on its research and analysis of First United's historical financial and operational performance, filings with the Securities and Exchange Commission (the "SEC") and regulatory data as well as discussions with other market participants, Driver determined in early 2019 that FUNC's stock price was trading at a substantial discount to the price that Driver believed might be obtained in a sale.

15.     In addition, based on the current and historical share ownership of First United's directors and management, the tenure of First United's directors, the amount First United's directors were paid for service on the Board relative to their ownership of First United common stock and other subjective factors, Driver concluded that First United's directors' interests were not aligned with shareholders' interests generally, and that the principal impediment to a sale to increase the value of all shareholders' investment in FUNC was a board more interested in protecting their own interests than increasing shareholder value.

16.     Driver communicated its view that First United was likely worth far more in a sale than as a standalone business by letter dated March 15, 2019 to Defendant Rodeheaver, Chairman and CEO of First United.  Driver requested that First United retain a qualified investment bank to solicit acquisition proposals from other banks for the purpose of testing the market.  Driver also wanted to discuss First United's financial and operating performance with Ms. Rodeheaver.

17.     On March 26, 2019, Driver publicly expressed its views regarding First United by filing exempt solicitation materials with the SEC, which (i) stated Driver's belief that First United would be worth more in a sale than independent, (ii) expressed concern regarding First United's corporate governance and lack of alignment with shareholder interests, (iii) requested that First

United retain financial advisors and explore a sale, and (iv) stated Driver's intention to vote against First United's nominees for director and against approving the compensation paid to First United's executive officers in 2018 at the Company's 2019 annual meeting of stockholders.

18.     On March 28, 2019, Driver filed exempt solicitation materials with the SEC, comparing First United's total (negative) shareholder return for the period March 23, 2016 to March 26, 2019 to selected indices and publicly-traded banks.  Driver also examined the compensation from First United to the individual directors who had served continuously on the Board since before 2006.

19.     Driver continued to communicate publicly and with Company management throughout the summer of 2019, reiterating its view that engaging an investment bank to evaluate a potential sale was more likely to improve shareholder value than continuing with the failed policies historically embraced by the entrenched board.

20.     On August 28, 2019, Driver purchased additional shares in FUNC, which increased Driver's stake in the corporation from 4.970% to 5.005%.  By comparison, based on information contained in FUNC's 2019 Proxy Statement, First United's directors and officers as a group collectively owned shares representing only 4.3% of First United's outstanding common stock.

21.     Because its beneficial ownership exceeded 5% of a public company's stock, Driver filed a Schedule 13D with the SEC the following week, as it was required to do by federal law.  17 C.F.R. § 240.13d-1.  Driver is not a registered investment adviser and does not fall within any other enumerated class of person in 17 C.F.R. § 240.13d-1(b)(1)(ii) who may file a Schedule 13G in lieu of a Schedule 13D.

22.     The Schedule 13D filed by Driver publicly reported acquisition of the interest and its purpose, in full recognition of federal prohibitions against false or misleading statements.  As

reported in its Schedule 13D, Driver purchased shares in First United based on its belief that the shares, when purchased, were trading at a significant discount to fair value and that the then-current market price for First United's common stock did not fully reflect the value that might be obtained for the shares in a sale of First United to a larger banking organization.  In response to the instructions for "Item 4. Purpose of Transaction" of Schedule 13D, Driver disclaimed any present plan or proposal to directly cause the sale of the company or change the board of directors or management, among the matters set forth in subparagraphs (a)–(j) therein.

**II.**      <u>**First United And The Legacy Directors Identify Driver As A Threat**</u>.

23.      The Directors interpreted Driver's public call for action to increase shareholder value and scrutiny of their failings as a direct threat to their interests and the cozy relationship they had enjoyed for decades.  On September 5, 2019, First United filed a Form 8-K claiming, *inter alia*, that Driver had "announced its intention to launch a distracting and costly public campaign."

24.      Driver had done no such thing, and it filed an amendment to the Schedule 13D the next day to eliminate any confusion caused by First United's 8-K and plainly state what Driver had actually done: implore First United to constructively engage with shareholders regarding their legitimate concerns around shareholder value.  Driver also invited First United to provide shareholders a summary of its current strategy to enhance shareholder returns, with specific initiatives in place of aspirations.

25.      First United did not immediately respond or provide shareholders any additional insight into the company's supposed strategy for improving shareholder value.

26.      On September 26, 2019, Driver released a presentation highlighting its concerns regarding First United's poor corporate governance practices.  Driver criticized the Board's excessive tenure, poor risk oversight, entrenchment and conflicts of interest, all of which Driver believed demonstrated that the Board's fundamental priority was not to increase shareholder value

but preserve a culture of cronyism.  In a press release, Driver raised the possibility of nominating candidates for director at First United's next annual meeting, typically held in May each year, unless the Board took immediate steps to increase shareholder value.

27.     The Legacy Directors identified Driver as a threat to their continued enjoyment of their separate interests as directors (including compensation for their service in the form of directors' fees, status in the community, lucrative business relationships, preferential self-dealing transactions between the bank and the directors' individual business interests, and otherwise) and complete lack of accountability to which they had grown accustomed over decades of below-market performance without shareholder demands for improvement.  Each Legacy Director knew that he or she likely would not continue as a director in the event of a sale.

## III.     First United Uses Its Access To State Regulators To Instigate A Government Investigation Into Driver.

28.     On November 19, 2019, Driver announced publicly what it had reported to First United in October—that Driver intended to nominate three fellow shareholders to the Board: Dr. Michael J. Driscoll, Ethan C. Elzen, and Lisa Narrell-Mead (*i.e.*, the Driver slate of nominees).

29.     Unbeknownst to Driver, the Legacy Directors had been working with the company's outside counsel to develop a plan to "protect" the bank—and their individual board seats—from shareholder scrutiny by foreclosing the possibility of a contested election of directors.

30.     The essence of Defendants' plan (the "Disenfranchisement Plan") was to invalidate Driver's voting and nomination rights—thereby removing any competition for board seats—by pressuring the Commissioner to find Driver in violation of a statute that empowered the Commissioner to strip certain voting rights in certain circumstances.  At all times relevant to this action the Commissioner was Anthony "Tony" Salazar.

10

31.     The key components of the Disenfranchisement Plan consisted of (i) pressuring the Commissioner directly and through surrogates to use his enforcement authority (ii) to prohibit Driver from voting its shares of First United common stock for five years, (iii) which First United would then use as a pretext for denying Driver's right to nominate candidates for election to the First United Board.  The first step of the Disenfranchisement Plan was lobbying the Commissioner to open an investigation into whether Driver's purchase of FUNC shares were made in violation of FI § 3-314.

**A.     Statutory Framework of the Banking Commissioner.**

32.     The Commissioner is the primary state regulator responsible for overseeing Maryland-chartered financial institutions like First United.  The Commissioner's office is housed in the Maryland Department of Labor, Licensing, and Regulation ("DLLR"), and the Commissioner is appointed by the Secretary of Labor.

33.     Like the Federal Reserve Board does with federally regulated bank holding companies, the Commissioner conducts regular examinations and engages in direct oversight to evaluate the safety and soundness of the financial institutions within its regulatory jurisdiction. Such supervisory information is generally shielded from public disclosure under a so-called regulatory privilege or, in certain cases, a deliberative process privilege.

34.     This ongoing supervisory relationship fosters a continuous dialogue and day-to-day working relationship between the regulatory staff and the financial institutions they are responsible for overseeing.

35.     The statutory framework for the Commissioner's regulation of Maryland financial institutions like First United is set out in the Financial Institutions ("FI") Article of the Annotated Code of Maryland.

36.     The Commissioner is empowered by Title 2 of the Financial Institutions Article (specifically FI §§ 2-113 through 2-116) to investigate and enforce actual and suspected violations of the Financial Institutions article, including FI § 3-314, entitled "Approval of Commissioner of certain stock transactions."

37.     In general terms, Section 3-314 authorizes the Commissioner to evaluate and, in specified circumstances deny, proposed "stock acquisitions" in a Maryland bank or bank holding company. "Stock acquisition" is defined as either (i) acquiring 25% of the voting stock of a commercial bank, or (ii) otherwise acquiring voting stock that "will affect the power to direct or to cause the direction of the management or policy" of the banking institution or holding company. Section 3-314 does not state what percentage of stock ownership triggers its requirements.

38.     Where the Commissioner determines a "stock acquisition" to be anticompetitive or to threaten the safety or soundness of a banking institution, the statute provides that "[v]oting stock that is acquired in violation of this section may not be voted for 5 years."

**B.     First United's Plan to Disenfranchise Driver and Invalidate Its Nominations.**

39.     First United's regulatory and corporate counsel is Andrew Bulgin ("Bulgin") at Gordon Feinblatt, LLC, f/k/a Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC ("Gordon Feinblatt").   Gordon Feinblatt, and Bulgin in particular, regularly participated in oversight discussions with the Commissioner's staff and with Mr. Salazar himself.  Bulgin was on a first-name basis with the Commissioner, his assistant commissioners, the regulatory staff, and counsel.

40.     At all relevant times, Bulgin was acting as an agent of the board and the Company.

41.     Bulgin regularly consulted with First United management and Legacy Directors about Driver's stated concerns, most frequently but not exclusively with Defendant Rodeheaver. Tonya Sturm, First United's chief financial officer and secretary, regularly forwarded Driver's

communications to Bulgin, who worked closely with First United in crafting its reactions, responses, and strategies throughout 2019.

42.     In an effort to silence Driver and protect the Legacy Directors' seats on the board of directors, First United and its Directors adopted the Disenfranchisement Plan with Bulgin's help to persuade the Commissioner to strip Driver's voting rights for five years.

43.     First, Bulgin e-mailed his contacts at the Commissioner's office to find out whether Driver had submitted an application to the depository institutions side of the office before purchasing shares of FUNC.  Bulgin supplemented the e-mail with a request under the Maryland Public Information Act ("MPIA"), the Maryland analogue to FOIA) on October 9, 2019.

44.     The assistant commissioner for depository corporate activities promptly determined that the office had no record of any "stock acquisition" applications responsive to First United's MPIA request, and the staff telephoned Bulgin October 15 to "set up a time to chat."  The staff thereafter confirmed that the Commissioner had no record of an application under FI § 3-314 within the preceding five years.

45.     With that confirmation, Bulgin began preparing a detailed petition designed to persuade the Commissioner to open an investigation into Driver for the purpose of stripping away Driver's voting rights.  Bulgin completed the submission and several hundred pages of supporting materials on October 31, and had it hand-delivered to the Commissioner and his staff on November 1, 2019.

46.     Recognizing that "[o]bviously, the Maryland Commissioner has jurisdiction with respect to violations of Section 3-314 of the FI Article," First United attempted to persuade him to agree with the bank's theory: "Because Driver did not file an application with respect to such acquisitions [of FUNC stock], we believe that Driver violated Section 3-314 of the FI Article and

is therefore prohibited from voting any of its shares of the Company's common stock for five years."  First United appears to contend that no finding or other due process is required before Driver "is" prohibited from voting its shares.  At no point did Bulgin or First United suggest that First United could take any action with respect to FI § 3-314 as a matter of private right.

47.     First United was explicit about its intention and objective: "We hereby respectfully request that the Maryland Commissioner exercise its authority pursuant to Sections 2-114 and 2-115 of the FI Article and immediately investigate this matter and take such other actions with respect thereto as it deems appropriate, including . . . prohibiting Driver from voting any of its shares of the Company's common stock for the next five years . . . ."  First United then pledged to assist the Maryland Commissioner with its investigation in any way that it could.

48.     The Commissioner had neither requested the November 1, 2019 submission, nor had knowledge of it until Bulgin e-mailed the Commissioner's staff at the end of October telling them to expect a delivery from him on behalf of First United and the Legacy Directors.

49.     First United's submission was crafted as advocacy designed to serve First United's stated goal.  It was premised on, and advanced, multiple false and misleading assertions, including *inter alia*:

>    a.    that Section 3-314 governs any effort by shareholders to make their views known to, and try to persuade management, without regard to whether the shareholder holds any power "to direct" management;
>
>    b.    that filing a SEC Schedule 13D by a person not eligible to file a Schedule 13G constitutes an "admission" that the filer intends to exercise control over the target company;
>
>    c.    that repeated calls for management to consider a sale equate to "forcing" a sale onto company management;
>
>    d.    that publicizing a shareholder's views regarding the prudence (or imprudence) of management decisions constitutes unlawfully "influencing" other stockholders in their views;

14

e.   that stating an intent to nominate candidates to stand for election against incumbents constitutes an effort to "control the strategic direction" of the company in violation of FI § 3-314; and

f.   that addressing shareholder concerns placed such "significant strains on the ability of the Company's board and management team," as to jeopardize the safety and soundness of First United.

50.   All of the foregoing premises are false.

51.   First United admitted that its intent was for the Commissioner to strip Driver of its voting rights so First United could deny the validity of Driver's nominations. In an informal e-mail dated December 13, 2019 to the Commissioner, his legal counsel, and his staff, Bulgin complained about the bad press First United was likely to receive if it ignored another of Driver's concerns—one relating to a plurality voting "carve-out" applicable to the election for which Driver had nominated candidates. In surprising candor, Bulgin conveyed:

> First United does not want to . . . take some action that could be seen as an acknowledgement that Driver's nominations are valid. Of course, this issue completely dissolves if he is prevented from voting and, thus, making nominations, and I was hoping that we might have some clarity on the outcome of the investigation.

52.   After adopting a resolution to employ plurality voting at the 2020 annual meeting, First United explained that it had been motivated primarily by the Board's desire to advance its proxy campaign against Driver, rather than by considerations of prudent corporate governance practices. As it explained at the time:

> The Board really had no choice but to adopt the voting carve-out, because a failure to do so would not have been viewed favorably by the proxy advisory firms ISS and Glass Lewis and would have made it more likely that they would have recommended to stockholders that stockholders vote against the Board's proposals and for Driver's nominees at the 2020 annual meeting.

53.   But even as First United felt compelled by its campaign priorities to adopt a plurality carve-out for contested elections, its rationale for doing so through a board resolution rather than a bylaw amendment (as Driver had proposed) was that it hoped the Commissioner

15

would cancel Driver's voting rights (thereby, in First United's view, invalidating Driver's nominations), mooting the issue so the Board would not have to deal with it:

> You will notice that the Board was very careful in how it worded the carve-out: IF there is a contested election at the 2020 annual meeting, then the carve-out will apply. If there is no contested election because it is determined that Driver is not entitled to vote its share[s] or, thus, submit director nominations, then the carve-out approved by the Board will be rendered moot. Because we do not yet know what position the DLLR will take, the Company's strategy for dealing with Driver must assume the worst.

54.     First United continued its unsolicited campaign to the Commissioner for months. By March 30, 2020, FUNC filed a preliminary proxy statement with the SEC, the contents of which are at issue in the proposed amended complaint currently under consideration in the 2020 Driver Action.  The March 30, 2020 preliminary proxy statement invoked the Commissioner's investigation to opine: "If Driver Management is ultimately prohibited from voting its shares of Common Stock or nominating the Driver Nominees, then any proxy that you deliver to Driver Management will be void and your vote will not be counted."  Upon review, the SEC advised that the stated opinion did not flow directly from the language of the company's bylaws and directed First United to remove it.

### C.     First United's Efforts to Cover Its Tracks.

55.     First United developed its Disenfranchisement Plan no later than October 2019 and took a significant step towards implementing that plan on November 1, 2019 by requesting that the Commissioner investigate Driver, but First United said nothing about it publicly, or to investors, or to Driver itself.

56.     Instead, First United's strategy depended on persuading the Commissioner to launch an investigation without disclosing First United's role, thereby enabling the bank to deny that it had anything to do with the allegations, and point to Driver as "under investigation" or, better yet, "in violation of Maryland law."  The Board knew that shareholders and proxy

advisors—including Institutional Shareholders Services ("ISS") and Glass Lewis, which provide proxy voting advice to institutional investors—would view First United's Disenfranchisement Plan as information that was not only highly material to their voting decision (or, in the case of the proxy advisors, their recommendation), but also information that would likely cast an extremely negative light on the Board, its respect for shareholders' rights and its commitment to good corporate governance practices.

57.     First United falsely characterized its November 1, 2019 submission as "information obtained in the course of . . . examin[ing] the Company and the Bank," so that it might be shielded from disclosure under the regulatory privilege.  It wasn't.

58.     First United's true motivation was to avoid having to disclose that the investigation, should one be opened, was in fact instigated by First United, and that First United was actively attempting to influence its direction and outcome, both through communications with the Commissioner and by enlisting other Maryland state officials to exert pressure on the Commissioner.  After its November 1, 2019 submission, Bulgin e-mailed Commission staff (including counsel) that "[i]f you decide to send any correspondence to third parties and feel it appropriate to copy me or the Bank, I would appreciate that those be blind-copies so that neither my name nor the Bank's name is associated with anything you send out."

59.     First United supplemented its November 1, 2019 petition and e-mail with scores of unsolicited submissions, additional legal analyses, and reports of ongoing concerns raised by Driver with respect to failings in First United management.  Among the submissions were two uninvited memoranda prepared on behalf of First United and the Legacy Directors and submitted January 7, 2020 and January 17, 2020.

17

60.     The following month, Bulgin e-mailed Commission staff about their (now open) investigation of Driver, removing any doubt that First United was trying to hide its role in the investigation from public scrutiny: "I don't know when your meeting with Driver is, but, as I stated during our meeting, it is extremely important to FUNC that Driver not come away from that meeting feeling that FUNC instigated your investigation."

61.     Throughout this period, Bulgin regularly reported back to the Legacy Directors, who approved and ratified the actions he pursued on their behalf.

**IV.     First United's Campaign To Pressure The Commissioner To Act.**

62.     Despite repeated e-mails, submissions, and other inquiries to the Commissioner's office throughout November and December 2019, First United was not certain by January 2020 whether the office had opened the investigation for which Defendants had been lobbying. So First United enlisted the help of State Senator George Edwards, Garrett County Delegate Wendell Beitzel, and representatives of Governor Hogan's office to pressure the Commissioner into taking action against Driver. As before, Bulgin regularly updated the Legacy Directors on the progress of his lobbying efforts.

63.     Also in early January, well before the first interaction with the Commissioner disclosed in the Preliminary Proxy Statement, Mr. Salazar responded to continued pressure from First United and from elected officials, expressing to Bulgin his uncertainty that it was appropriate for him to pursue an investigation of Driver. In response, Bulgin sent the Commissioner an e-mail (addressed to "Tony") explaining that the enforcement sections of Financial Institutions Title 2 (§§ 2-114 through 2-117) "unquestionably" authorize the Commissioner to go after Driver. In the same e-mail, Bulgin requested a short in-person meeting to discuss "some final thoughts".

64.     On January 15, 2020, prompted by requests from the Legacy Directors, Senator Edwards and Delegate Beitzel contacted the Governor's office to request a meeting with the

18

Secretary of Labor, the Commissioner, and Defendant Rodeheaver, to discuss the investigation for which First United had been lobbying since October 2019. That meeting was scheduled for January 22, 2020. This, too, predated by a month the first interaction with the Commissioner disclosed in the Preliminary Proxy Statement.

65.     On January 21, 2020, the day before his meeting with the elected officials and his boss, the Commissioner had his Director of Enforcement notify Driver that his office had opened an investigation under FI § 3-314 into Driver's purchase of FUNC stock.

66.     Bulgin and First United coordinated closely with the Commissioner, and expected notice of the investigation to stop Driver in its tracks. When Driver made statements critical of the Legacy Directors on January 22, 2020, Bulgin concluded that Driver must not be aware of the inquiry, as he stated in an e-mail to an assistant Commissioner: "the fact that Abbott Cooper . . . filed additional soliciting material today makes me think that Abbott has not received the Commissioner's letter."

67.     That was the same day, January 22, 2020, the Commissioner and his boss, Secretary of Labor Tiffany Robinson, met in Senator Edwards's General Assembly office with Delegate Beitzel, representatives of the Governor, Defendant Rodeheaver, and Bulgin, for the purpose of discussing FUNC's allegations and requesting that the Commissioner be persuaded to step up the pace and intensity of his investigation into Driver's purchase of First United common stock. Defendant Rodeheaver and Bulgin reported to the Legacy Directors both before and after the January 22 meeting, and obtained their approval to take actions in furtherance of their collective goal of persuading the Commissioner to invalidate Driver's voting and nomination rights.

68.     By January 27, 2020, Bulgin was e-mailing the Commission staff, reflecting both the close involvement of First United in launching the investigation as well as the extensive coordination between the Commissioner's office and the bank:

> I'm curious whether your office has gotten any response from Driver, either a substantive response or a simple acknowledgement of receipt of the letter that was sent to Driver. If you could let me know either way, that would be helpful . . . . [Driver] is continuing to file soliciting material with the SEC regarding his campaign, and **that has everyone feeling a bit nervous** that maybe he doesn't regularly check his post mail and might not have seen the letter." (Emphasis added.)

69.     The "everyone" referenced in Bulgin's January 27 e-mail referred to the Legacy Directors, who were closely monitoring and fully informed of the progress of the disenfranchisement campaign.

70.     All of the foregoing predated the first interaction with the Commissioner disclosed in the Preliminary Proxy Statement.

71.     From February 11–13, 2020, the Governor's office reported privately to Senator Edwards that the Commissioner was planning to coordinate with First United about the investigation and that there has been "lots of communication with the investor [Driver];" Senator Edwards in turn notified Rodeheaver of the Commissioner's progress.

72.     On February 19, 2020, Bulgin met with Commission staff for the purpose of discussing the investigation into Driver.

73.     On March 12, 2020, Senator Edwards again contacted Secretary Robinson at Defendants' behest, stating that he was "anxious to have this resolved."  On March 23, the Commissioner issued additional information and document requests to Driver.

74.     On March 26, 2020, one of FUNC's board members, Defendant Gary Ruddell, appealed to Senator Edwards and Delegate Beitzel, copying other FUNC directors, expressing frustration that the Commissioner had not held Driver to be in violation of Maryland law.  The

lawmakers responded the same day, again asking Secretary Robinson to "help the bank" deal with Driver, and again asking the Governor's office to intercede.

75.     On April 16, 2020, Driver submitted a supplemental response to the Maryland Commissioner's March 23 requests, explicitly questioning First United's role spinning up the investigation.

## V.     First United Aggressively Markets The Presumed Effect Of The Investigation Without Waiting For The Commissioner To Actually Find Liability.

76.     First United attempted to capitalize on the existence of the Commissioner's investigation to imply that Driver's position lacked merit, to call into question Driver's ability to vote, and to confuse investors as to the validity of Driver's nomination of candidates for election to the board.

77.     From March 30 through May 12, 2020, First United made multiple false or misleading statements in press releases and preliminary and supplemental proxy materials, which are the subject of other pending litigation.  The thrust of many of these challenged statements is that the Commissioner had independently opened an investigation into Driver without prompting by Defendants, such that its mere existence was a sufficient basis to discount Driver's votes and nominations.

78.     On May 14, 2020, the Commissioner wrote a letter to Driver advising that his staff believed there was evidence to pursue a finding that Driver had violated FI § 3-314. The Commissioner himself had not reached any conclusions or made any findings, but he indicated that he would consult the state Attorney General's office as to next steps. At First United's request, the Commissioner agreed to send a courtesy copy of the letter to First United.

79.     Driver issued a press release the following day questioning whether First United played a role instigating the Commissioner's investigation.  Driver suspected that First United had

been working behind the scenes to drive its agenda through the Commissioner, but Driver could not know with certainty, and First United repeatedly denied having been involved.

80.     In multiple SEC filings, First United had already denied that the company was behind the investigation, and implied—or stated outright—that the investigation was a matter solely between the Commissioner and Driver resulting from independent action by the Commissioner in which Defendants played no role.

81.     On May 18, 2020, First United released a statement falsely proclaiming that the Commissioner had found Driver in violation of Maryland law and denying any involvement by First United or its executives attempting to influence the investigation.   By that date, the Commissioner had not adopted the view of his staff, or any particular view, concerning a potential violation (and would later go on to specifically disclaim making any such finding).  Driver sought assurances from First United that it would honor Driver's shareholder rights at the upcoming annual meeting, unless and until a final and binding determination that Driver had violated FI § 3-314.

82.     On May 20, 2020, in lieu of providing the requested assurances, First United filed a declaratory action against Driver in the Circuit Court of Maryland for Garett County, Case No. 11-CV-20-42.  The pretextual premise of the lawsuit was that the Commissioner found in his May 14 letter that Driver had violated FI § 3-314, and that First United required declaratory relief for the purpose of recognizing the liability determination that the Commissioner supposedly had already made.  That premise was false.

83.     First United transmitted a copy of the Garrett County complaint to Driver that afternoon, explaining that "[b]ased on conclusive findings of the Maryland Regulator, First United

does not intend to count votes attributable to First United common stock owned by Driver . . . at First United's 2020 annual meeting of shareholders."

84.     Also on May 20, 2020, First United filed additional soliciting materials with the SEC, repeating or otherwise asserting multiple false or misleading statements presently at issue in other pending litigation, including: (a) that the Commissioner issued letters "in which it concluded . . . that there is sufficient evidence to find" that Driver and its nominees violated FI § 3-314.; (b) that Driver "ignore[d]" the Commissioner's May 12 letter "as well as Maryland law."; (c) that Driver cannot exercise its voting shares for five years because it violated FI § 3-314; (d) First United characterized the nature of the state court declaratory action as to "confirm . . . that Driver and its proposed candidates are prohibited from voting."; (e) "First United did not instigate the Investigation."; (f) "Driver was found to be in violation of Maryland law."; (g) "[Driver] is prohibited from voting its shares at the Company's upcoming Annual Meeting."; (h) "First United's executives [did not] use their positions or relationships . . . to influence the investigation."; and (i) Driver was not operating "within the confines of the law."

85.     In reality, the Commissioner did not adopt the position of his staff referenced in the May 14 letter. Instead, he declined to conclude that Driver had violated FI § 3-314 or any other statute, and he closed the investigation without making any findings at all, thereby terminating the administrative process and settling the matter once and for all.

86.     By Settlement Agreement and Consent Decree dated May 22, 2020 (the "Final Order")—two days following the filing of First United's complaint—the Commissioner closed his investigation with no findings of liability, stating: "nothing [in the final order] shall be construed to mean, or to authorize any individual or business entity to assert, that the Commissioner has made any conclusive findings or determination that [Driver] violated FI § 3-314." Ex. A at ¶ 10.

23

87.     The Final Order made clear that, notwithstanding any views held by his staff, the Commissioner explicitly declined to make any conclusive findings or a determination that Driver violated FI § 3-314.  It states: "[N]othing herein shall be construed to mean, or to authorize any individual or business entity to assert, that the Commissioner has made any conclusive findings or determination that either Respondents or Beneficiaries have violated FI § 3-314." Ex. A ¶¶ 2, 4, 5, 10.

88.     The next business day (May 25, 2020), Driver publicly posted a copy of the Final Order and requested that First United dismiss the unfounded complaint.  The Commissioner also posted a copy of the Final Order on the official State website: www.dllr.state.md.us/ finance/consumers/enforcement.shtml.

89.     First United declined to withdraw the complaint in the Garrett County Action.  That action, subsequently amended then removed to this Court (the FUNC lawsuit), is currently stayed pending certification of a question to the Maryland Court of Appeals.  First United makes certain false and misleading statements about the FUNC lawsuit in its Revised Proxy Statement, discussed below.

90.     First United held its annual meeting on June 11, 2020, where an election was conducted for three seats on the board of directors.  The process of that election, the content of Defendants' proxy statements leading up to it, and Defendants' conduct in late 2019 and the first half of 2020 are all at issue in other pending litigation.

91.     The annual meeting of First United's shareholders is again approaching, although First United has not yet set or announced the date.

92.     On March 1, 2021, First United filed a Preliminary Proxy Statement with the SEC, in advance of the 2021 annual meeting of shareholders.  The Preliminary Proxy Statement includes

24

multiple false and misleading statements of material fact, and omissions of material facts, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9, summarized below in roughly chronological order.

93. On Friday afternoon, March 26, 2021, First United filed the Revised Proxy Statement, deleting without correction or comment the "Background to the Solicitation" section that included many of these false and misleading statements. The Revised Proxy Statement does not correct the false or misleading statements that were withdrawn, and the Revised Proxy Statement retains additional statements that are also false or misleading. The Revised Proxy Statement is a solicitation for the same meeting or subject matter as the Preliminary Proxy Statement—namely, votes for director candidates and competing proposals at the upcoming 2021 annual meeting.

### A. Statements Regarding "Constructive Dialogue"

94. On October 16, 2019—one week after First United had already submitted a request to the Commissioner for documents related to whether Driver had sought pre-approval under FI § 3-314—attorneys for First United spoke with attorneys for Driver about the concerns Driver had raised earlier in the year.

95. Representing First United were Bulgin as well as two attorneys from the firm Vinson & Elkins LLP: Lawrence Elbaum and Patrick Gadsen.

96. In the Preliminary Proxy Statement, First United characterizes this telephonic meeting as follows:

> On October 16, 2019, the Corporation's counsel met telephonically with Driver Management's counsel to introduce the possibility of a cooperation framework. During these discussions, the Corporation's counsel indicated that the Corporation would cooperate with Driver Management to identify director candidates to enhance the composition, skillset and experience of the Board as part of the Corporation's ongoing refreshment process. Driver Management's counsel stated that Driver Management was not willing to entertain a cooperation framework

25

without a commitment by the Board to initiate a formal sale process as part of such framework.

97.    The October 16, 2019 telephonic meeting did in fact occur, but First United's description of it in the Preliminary Proxy Statement is misleading.  At the time of the meeting, Defendants already had formed their Disenfranchisement Plan (to lobby the Commissioner in an effort to persuade him to prohibit Driver from voting and thereby provide a pretext for invalidating Driver's nominations) and already had taken steps to begin implementing it.

98.    By failing to disclose that they had already formulated and begun to execute the Disenfranchisement Plan, the statements in the Preliminary Proxy Statement regarding the October 16, 2019 meeting omit to state a material fact necessary to make those statements not false and misleading.

99.    Based on the account of the October 16, 2019 meeting set forth in the First United Preliminary Proxy Statement, a reasonable reader might conclude that First United was, in good faith, interested in reaching some type of cooperation agreement with Driver regarding the composition of First United's board of directors as well as other corporate governance matters. However, if the facts, circumstances and timing of the Disenfranchisement Plan were disclosed, that reasonable reader instead is likely to conclude that the October 16, 2019 meeting was merely evidence of pro forma gamesmanship on the part of First United and that First United's interest in any type of "cooperation framework" was not genuine.  A reasonable investor would consider First United's duplicity in negotiating with one of its largest shareholders material in determining how to vote its shares at the 2021 annual meeting.

100.    First United continued the theme in its Preliminary Proxy Statement when describing a February 6, 2020 letter from Defendant McCullough to Driver:

On February 5, 2020 [*sic*], the Corporation issued a press release which included a copy of Mr. McCullough's letter to Mr. Cooper, in which Mr. McCullough

26

described the Corporation's numerous attempts to engage in a constructive dialogue with Driver Management.

101. The statement is misleading. By the time of the letter from Defendant McCullough, First United already had been implementing its Disenfranchisement Plan for more than three months. It had been lobbying the Commissioner and calling in favors to elected officials to try to get Driver's nominees removed from the 2020 ballot, and more generally to strip Driver of its voting rights. First United, and Defendant McCullough specifically, were fully aware of these efforts.

102. Any statements, including those made in reference to Defendant McCullough's letter regarding "attempts to engage in constructive dialogue with Driver" that omit to provide a complete and accurate description of the Disenfranchisement Plan and Defendants' actions in furtherance of it are false and misleading. The notion that First United was attempting to engage in useful dialogue to improve its relationship with one of its largest shareholders is subsumed by Defendants' simultaneous—and secret—efforts to cause Driver to be stripped of voting and nomination rights. A reasonable shareholder would consider First United's false and misleading statements regarding "constructive dialogue" to be material because they concern First United's willingness to intentionally mislead both Driver and other shareholders regarding the sincerity of efforts to engage with shareholders about their concerns, and specifically with Driver about its concerns.

103. First United deleted these two sections in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

B.      Statements Regarding the "Plurality Carveout"

104.    On December 16, 2019, First United announced that the Board had "approved a plurality voting exception for the 2020 annual meeting of shareholders."

105.    In its Preliminary Proxy Statement, First United asserts that its rationale for approving the 2020 exception was that the Board did not want to amend First United's bylaws to provide for a permanent plurality carveout for contested elections until after the Board had conducted a "fulsome, holistic review of the Bylaws, with an eye toward addressing changing shareholder expectations and evolving corporate governance practices," and that the "Board determined that it would wait until the abovementioned review was completed to make any formal amendments to the Bylaws."

106.    First United's statement is false. A contemporaneous e-mail from Mr. Bulgin to the Commissioner at the time of the decision in December 2019 provides a more candid view of the reason for the Board's reticence to amend First United's bylaws: First United was hoping that the Maryland Commissioner would prohibit Driver from voting any of its shares held at the time. As a result, under First United's stated interpretation of its bylaws, Driver would have been prevented from making director nominations for the 2020 election, thereby eliminating the threat of a contested election at the 2020 annual meeting.

107.    In another email, Mr. Bulgin detailed the rationale for the specific language used in the December 16, 2019 8K:

> I wanted to make it clear that in adopting a plurality carveout to the majority voting standard, the Company's Board in no way acknowledged, or intended to acknowledge, that Driver's nominations should be given effect or that Driver should be able to conduct a proxy contest with respect to the 2020 annual meeting. We and the Company continue to believe strongly that Driver's acquisitions of First United stock violated FI Section 3-314 and that Driver is prohibited from voting its shares for 5 years. You will notice that the Board was very careful in how it worded the carveout: IF there is a contested election at the 2020 annual meeting, then the carveout will apply. If there is no contested election because it is determined that

28

Driver is not entitled to vote its share [sic] or, thus, submit director nominations, then the carve approved by the Board will be rendered moot. Because we do not yet know what position the [Maryland Commissioner] will take, the Company's strategy for dealing with Driver must assume the worst.

108.    First United's contemporaneous statements are the primary reason why the Board did not want to amend First United's bylaws to provide for a plurality carveout.  It was hoping (and anticipating) that the Commissioner would take action to prohibit Driver from voting its shares—action that would First United asserted would allow it to refuse to recognize Driver's director nominations as being validly made. The notion that the Board was interested in completing some "fulsome, holistic review of the Bylaws" was primarily used as an excuse to delay making more substantive corporate governance changes until the perceived threat of a Driver-led proxy contest was neutralized.

109.    First United deleted its statements relating to the plurality carve-out in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

**C.    Statements Regarding the February 19, 2020 Meeting with First United and the Commissioner's Office.**

110.    The first mention in the Preliminary Proxy Statement of any interaction or communication between First United and the Commissioner regarding the investigation is in reference to a meeting on February 19, 2020 between "the Corporation's counsel" and two investigators from the Commissioner.

111.    Given the fulsome chronology of events set forth by First United in the "Background to the Solicitation" and the absence of any mention of any prior contact, communications, or meetings between First United and the Commissioner regarding the investigation, First United intends readers to infer, falsely, that no such prior contact, communication, or meetings had occurred.

112.    But First United was in frequent contact with the Commissioner regarding the investigation beginning in earnest with the November 1, 2019 Letter.  Thus, by failing to provide an accurate and complete description of First United's prior contacts, communications, and meetings with the Commissioner, First United is omitting to state material facts necessary to make the statements about the February 19, 2020 meeting not false and misleading.

113.    First United deleted from its Revised Proxy Statement the "Background to the Solicitation" section—including its false and misleading impression that the company's first interaction with the Commissioner was in February 2020—but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

114.    Additionally, First United states in its Revised Proxy Statement that the Board "is fully aware of and closely oversaw" what it understands to be the target of one of Driver's proposals for the 2021 annual meeting—what First United describes as "the Corporation's discussion with representatives of the Commissioner regarding possible violations of the Maryland Stock Acquisition Statute by third parties and the subsequent investigation by the Commissioner of Driver Partners' acquisitions of the Common Stock."  By this statement, First United is explicitly referencing the interaction between First United and the Commissioner that resulted in the Commissioner's investigation of Driver's purchases, but the description fails to include any of the discussion necessary to correct the false and misleading impressions left from First United's earlier statements in the Preliminary Proxy Statement, and instead falsely implies that the company's only interaction was a "discussion" with representatives of the Commissioner.

30

**D.     Statements Regarding February 28, 2020 Telephonic Meeting Between Driver and First United**

115.    In its Preliminary Proxy Statement, First United describes a telephonic meeting between attorneys for Driver and attorneys for First United in February 2020, during the period that First United knew the Commissioner had already opened the investigation Defendants had been lobbying to have opened.  The Preliminary Proxy Statement states that "during such discussion, counsel for Driver Management communicated expressly that Driver Management was not under investigation or review by any regulatory agency or legal authority."  That statement is false; counsel for Driver made no such representation.

116.    The false statement in the Preliminary Proxy Statement was made with the specific intent of trying to persuade investors in advance of the 2021 annual meeting that Driver had been trying to deceive First United in 2020 regarding its knowledge of the investigation.

117.    First United deleted its statements relating to the February 28, 2020 meeting in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

**E.     Statements Regarding Regulatory Representation**

118.    In the Preliminary Proxy Statement, First United describes a series of back-and-forth discussions in early 2020 regarding whether Driver would make a representation (the "Regulatory Representation") in a term sheet being discussed in connection with a possible settlement of claims between Driver and First United. The subject of the Regulatory Representation was whether or not Driver was at the time under regulatory investigation.

119.    It is true that during these discussions, First United asked Driver to make the Regulatory Representation—*i.e.*, to affirmatively represent to First United that Driver was not under investigation by any governmental body.  At the time, First United was fully aware of the

Commissioner's investigation and was in frequent communication with the Commissioner's office, and others, regarding when Driver would be given notice of the investigation and whether and when the Commissioner would make any findings.

120.   Driver had been informed of the inquiry by the Commissioner and strongly suspected—but lacked actual knowledge—that it had been instigated by First United.  As a result, Driver believed that First United was trying to bait Driver into making a knowingly false representation, so that First United could terminate discussions on pretextual grounds.  Driver refused to make any representation concerning the existence or non-existence of any investigation by any government body.

121.   That First United was fully aware of the investigation at the time it made the request for a Regulatory Representation is not disputed. On January 27, 2020, Bulgin e-mailed the Commissioner to see if the Commissioner had received a response from Driver regarding a letter notifying Driver that the investigation had been opened:

> "I'm curious whether your office has gotten any response from Driver, either a substantive response or a simple acknowledgement of receipt of the letter that was sent to Driver.  If you could let me know either way, that would be helpful. Although Driver has been quieter than usual, he is continuing to file soliciting material with the SEC regarding his campaign, and that has everyone feeling a bit nervous that maybe he doesn't regularly check his post mail and might not have seen the letter (you'll recall that I sent you a good email address for Abbott, which he does regularly check)."

122.   By not providing an accurate and complete description in the Preliminary Proxy Statement as to First United's actual prior awareness of the investigation and its frequent coordination with the Commissioner, First United omits material facts concerning the Regulatory Representation, the inclusion of which would be necessary to make First United's description not misleading.

123. First United's statements regarding the Regulatory Representation are designed to imply that Driver was attempting to deceive First United or hide from First United the fact that the Commissioner had informed Driver of the existence of the investigation.  The implication of First United's statements regarding the Regulatory Representation are false and misleading because not only was First United aware that the Commissioner had informed Driver of the existence of the investigation but a reasonable reader, armed with that information, might well conclude that rather than Driver attempting to deceive First United, First United was engaged in gamesmanship with Driver in an attempt elicit a representation that First United knew to be untrue.

124. First United deleted its statements relating to the Regulatory Representation in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

### F.    Representation Regarding Driver's May 18, 2020 Letter

125. In its Preliminary Proxy Statement, First United states:  "On May 18, 2020, counsel for Driver sent a letter to the Corporation's counsel stating that any action by the Corporation to restrict Driver Partners from voting at the 2020 annual meeting or nominating directors to be voted upon at the 2020 annual meeting 'would be contrary to law,' despite the Commissioner's May 14, 2020 letter expressly citing the mandatory five year voting prohibition imposed as a consequence of a violation of the Maryland Stock Acquisition Statute."

126. The foregoing statement in the Preliminary Proxy Statement is false and misleading as it suggests that the Commissioner's May 14, 2020 letter operated to prohibit Driver from voting its shares for five years, or was evidence that the Commissioner had ruled, held, found, or otherwise determined that Driver was prohibited from voting its shares for five years.

127.   The Commissioner's May 14, 2020 letter contained no such prohibition.  Neither did the Commissioner ever find or determine that Driver's acquisition of FUNC shares violated Section 3-314.

128.   First United's account of the events of May 18, 2020 in its Preliminary Proxy Statement omits the material fact that earlier that same day First United issued a press release asserting that Driver was defaming First United by alleging that First United had influenced or controlled the Commissioner's investigation.

129.   In its May 18, 2020 release, First United stated: "First United did not instigate, direct or control the investigation into Driver's acquisition of the Company's shares, nor did any of First United's executives use their positions or relationships with trade associations to influence the investigation . . . . Any failure to comply with Maryland law . . . is the sole responsibility and fault of Driver and no one else."

130.   By failing to include statements recounting or describing First United's forceful (to the point of accusing Driver of defamation) denials of instigating the investigation, First United is omitting to state in its Preliminary Proxy Statement material facts necessary to make the totality of First United's current statements regarding its relationship with the Commissioner and its role in the investigation not false and misleading, particularly given First United's admission that "the Board is fully aware of and closely oversaw . . . the Corporation's discussion with representatives of the Commissioner regarding possible violations of the Maryland Stock Acquisition Statute by third parties and the subsequent investigation by the Commissioner of Driver Partners' prior acquisitions of the Common Stock."

131. First United deleted its statements relating to the May 18, 2020 letter in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

### G. Statements Regarding The FUNC Action

132. In its Revised Proxy Statement, First United removed the "Background to the Solicitation" section, but includes a discussion of the FUNC Action (what it calls the "Declaratory Relief Action"), among other matters, in the "Legal Proceedings" section.

133. There, First United describes its filings in the FUNC Action on September 8, 2020 this way:

> On September 8, 2020, the Corporation filed (i) papers opposing the defendants' motions to dismiss the Declaratory Relief Action and (ii) an amended complaint in the Declaratory Relief Action. In large part, the amended complaint dismissed claims against the Driver 2020 Nominees without prejudice, as they had all lost in the shareholder vote and had represented that they were no longer shareholders of the Corporation. Additionally, the amended complaint included updated allegations to reflect the outcome of the Corporation's 2020 Annual Meeting and other matters.

134. The foregoing description is false and misleading. The "updated allegations" in First United's amended complaint did not merely reflect the outcome of the 2020 annual meeting; rather, they adopted a completely new theory of liability and abandoned the theory on which the original Garrett County Action had been filed.

135. Where the original Garrett County Action asserted that the Commissioner found Driver in violation of Maryland law and that First United required a declaration of rights as to the impact of the Commissioner's supposed decision, the amended complaint filed on September 8 abandoned that theory entirely and instead sought to establish a private right of action by which First United might enforce FI § 3-314 to prove a violation by Driver that the Commissioner did not find occurred.

136. A reasonable reader would not understand from First United's description the fundamental shift in legal positions taken by the company in the two actions.  Rather, a reasonable reader would conclude that the amended complaint (currently pending as the FUNC Action) merely updated but maintained the original theory of the Garrett County Action—*i.e*., that First United was merely attempting to give effect to a violation that the Commissioner had determined.

137. A reasonable reader also would be unaware from First United's description that the company had in fact abandoned that theory, and that First United is the sole driving force behind the effort to strip voting rights (and, in First United's theory, nominating rights) from one of First United's largest individual shareholders.

**H.     Statements Regarding Settlement Agreement**

138. In its description of the Final Order that Driver entered into with the Commissioner on May 22, 2020, First United states in the Preliminary Proxy Statement: "This agreement did not resolve the issue of whether Driver Partners violated the Maryland Stock Acquisition Statute and was accordingly prohibited from voting its shares of Common Stock for a period of five years, including at the 2020 Annual Meeting."

139. The foregoing is a false and misleading statement of material fact because it suggests that absent any resolution of "whether Driver Partners violated the Maryland Stock Acquisition Statute," Driver was (and is) prohibited from voting its shares of Common Stock for a period of five years.

140. There is no current prohibition on Driver's ability to vote any of its shares of FUNC common stock, nor has there ever been such a prohibition.

141. First United prefaces its statements regarding the Final Order by stating: "Unbeknownst to, and without the involvement of, the Corporation, Driver and the Commissioner

had been negotiating toward a possible settlement of the Commissioner's investigation into Driver Partners' stock acquisitions."

142. This statement is false and misleading because it implies that First United was entitled to both prior notice of and some type of "involvement" in an agreement between Driver and the Commissioner that related to an investigation conducted by the Commissioner into action by Driver. While the overall facts and circumstances surrounding the Commissioner's investigation might well lead First United to have certain proprietary feelings (or evidence the existence of such feelings) towards the Commissioner and the investigation, First United had no legitimate interest in the investigation—unless, of course, the purpose of the investigation was to entrench the Board.

143. First United deleted its statements relating to the settlement agreement in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

I.      **Statement Regarding October 27 Review of "Independent Market Checks"**

144. First United makes the following statement in its Preliminary Proxy Statement: "On October 27, 2020, during a strategic planning session, the Board reviewed independent market checks provided by FinPro Capital Advisors, Inc. and Raymond James & Associates, Inc., in order to benchmark the Corporation's strategy relative to alternative transactions."

145. A "market check" is commonly understood to mean a process by which investment bankers actively canvass the market for potential buyers. A "market check" is generally not understood to mean investment bankers' estimates of potential sale valuations.

146. To the extent that FinPro Capital Advisors, Inc. and Raymond James & Associates, Inc. (together "First United's Investment Bankers") did not actually contact likely strategic buyers to ascertain their interest in acquiring First United (as well as the price such potential likely

strategic buyers might pay), the statement "market check" is a false and misleading statement of material fact.

147.    Whether First United's Investment Bankers compared actual indications of interest from ready, willing and able buyers (as opposed to hypothetical sale values based on valuation analyses prepared by First United's Investment Bankers) to First United's current and potential future standalone value would be extremely material to investors.

148.    First United deleted its statements relating to a market check in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

**J.      Statement Regarding Driver's January 13, 2021 Letter**

149.    First United makes the following statement in its Preliminary Proxy Statement regarding Driver's January 13, 2021 letter notifying the Board that Driver intended to nominate Mr. Cooper for election to the Board at First United's 2021 annual meeting of shareholders: "The Corporation responded to the 2021 Notice on January 13, 2021, requesting that Driver Management promptly amend or supplement the 2021 Notice to address certain deficiencies and clarify certain disclosures."

150.    The most natural reading of the foregoing statement is that First United identified deficiencies and requested clarifications on January 13, 2021, but that as of the date of the Preliminary Proxy Statement on March 1, 2021, Driver had not responded.   In fact, Driver responded only two days later, on January 15, 2021, both addressing and disputing the suggestion of "deficiencies" in First United's January 13 letter.

151.    First United's failure to reference the January 15, 2021 Letter constitutes an omission of a material fact necessary to make First United's statements regarding the 2021 Notice not false or misleading, since the failure to include such a reference the January 15, 2021 Letter

could lead a reasonable reader to conclude that Driver failed "to address certain deficiencies and clarify certain disclosures" in the 2021 Notice.

152.    In addition, this statement is false or misleading in that it intimates that First United may have some basis to dispute Driver's director nomination, albeit without providing a reasonable reader with any context or additional information upon which to form a view as to whether any valid grounds for disputing Driver's director nomination actually exists.

153.    First United deleted its statements relating to the January 15, 2021 letter in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

### K.    Statement ("Ability to Vote Statement") Questioning Driver's Ability to Vote the Challenged Shares at the 2021 Annual Meeting

154.    In its Preliminary Proxy Statement, First United states: "Based on its most recently available public filings, Driver Management has indicated that it beneficially owns an aggregate of 360,737 shares of Common Stock (representing approximately 5.2% of outstanding Common Stock), of which 360,637 shares are subject to ongoing litigation to determine whether they may be voted by Driver Management at the 2021 Annual Meeting, as described elsewhere in this Proxy Statement."

155.    Notwithstanding First United's claim in Garrett County, subsequently removed to this Court and stayed pending a certification action to the Court of Appeals, there currently exists no legal impediment to Driver's right to vote any of its FUNC shares.

156.     The Ability to Vote Statement implies that there currently exists some legal impediment to Driver's right to vote the Challenged Shares, which is false and materially misleading.

157.    First United also omits the material fact that the "ongoing litigation" referenced in the Ability to Vote Statement was brought and is being prosecuted only by First United, not by any governmental authority or other party, for the express purpose of seeking an order prohibiting Driver from voting its shares. The fact that First United is the sole driving force behind the referenced effort to create uncertainty into the ability of Driver to vote certain of its shares is a fact that is and would be material to investors.

158.    First United deleted its statements relating to the Ability to Vote Statement in its Revised Proxy Statement, but failed to correct these false and misleading statements, which relate to the same meeting or subject matter as the Preliminary Proxy Statement.

**L.    Statement Regarding Non-Binding Advisory Vote Related to the Maryland Stock Acquisition Statute**

159.    Driver has included the following proposal, captioned the "No Disenfranchisement Proposal" in its Form PRRN14A filed March 1, 2021 ("Driver's Preliminary Proxy Statement"):

> RESOLVED, that the shareholders of the Company request that the Board adopt a resolution whereby the Board commits to avoid taking any actions not otherwise explicitly required by law (including lobbying the Maryland Commissioner of Financial Regulation to investigate potential violations of Section 3-314) or seeking to enforce, through legal action or otherwise, any of the provisions of Section 3-314) not otherwise explicitly required by law that are reasonably likely to lead to the disenfranchisement of any shareholder.

160.    The crux of the No Disenfranchisement Proposal is a request that the Board commit to avoid taking any actions not explicitly required by law that are reasonably likely to lead to the disenfranchisement of any shareholder.

161.    While Driver references efforts to enforce the provisions of Section 3-314 as an included example of potential actions that reasonably could be likely to lead to the disenfranchisement of any shareholder, the No Disenfranchisement Proposal is not limited to actions premised on Section 3-314.

162.    By captioning and referring to Driver's No Disenfranchisement Proposal as a "Non-Binding Advisory Vote Related to the Maryland Stock Acquisition Statute," First United is making a misleading statement regarding the import, scope, and impact of the No Disenfranchisement Proposal.

163.    In addition, First United's rationale for recommending that shareholders vote "no" with respect to this proposal appears limited to a discussion of Section 3-314 and does not provide a rationale for voting "no" with respect to the actual subject matter of the proposal, *viz.*, a request that the Board commit to not take any action not required by law that would be reasonably likely to lead to the disenfranchisement of any shareholder.

164.    Insofar as the Board includes a summary rationale, it advocates for the Board to retain discretion to take such actions not prohibited by Maryland law "based on the Board's determination of what is in the shareholders' best interests," as distinct from what it regards as "in the best interest of the Corporation and its shareholders," referenced earlier in the same section.

165.    Yet, in moving to dismiss claims in the Driver 2020 Action, First United argued that "under Maryland law, corporate directors owe their duties directly and explicitly to the corporation," rather than to the shareholders directly.  According to First United, "Maryland law provides that those [fiduciary] duties do not extend beyond the corporation."  First United invoked other authorities for the propositions that a fiduciary duty "runs, however, to the corporation and not, at least directly, to the shareholders" and that "the duties of directors of a Maryland corporation in Section 2-405.1(c) *[sic]* run *explicitly to the corporation*, not to the stockholders." (emphasis original).

166.    The Board's stated rationale in the Preliminary Proxy Statement is at odds with its position as to the duties owed by the Board in its other public statements, which is materially

41

misleading. At a minimum, the statement is false and misleading—and frankly, confusing—because a reasonable reader may conclude that the Board believes that it must act in the best interests of shareholders, while the Board simultaneously believes that it is under no such obligation.

167. Defendants have retained in the Revised Proxy Statement the same false and misleading description discussed above from their Preliminary Proxy Statement.

**M.     Non-Binding Advisory Vote Regarding Rule 5640 of the NASDAQ Rules.**

168. Driver has included the following proposal, captioned the NASDAQ Voting Rights Rule Special Committee Proposal, in Driver's Preliminary Proxy Statement:

> RESOLVED, that the shareholders of the Company request that the Board form a special committee (empowered to engage its own legal counsel) to determine whether the Company violates NASDAQ Listing Rule 5640 by voluntarily asserting or attempting to exercise a private right of action under Section 3-314 or seeking a declaratory judgement "to clarify rights or legal relations affected by the operation of Section 3-314 absent a binding prior determination by the Maryland Commissioner of Financial Regulation or a court of competent jurisdiction that a violation has occurred.

169. In recommending that First United shareholders vote "No" with respect to this proposal, First United offers the following rationale:

> Further, the Board is fully aware of and closely oversaw the actions of the Corporation that Driver Management is seeking to target through this Proposal, i.e., the Corporation's discussion with representatives of the Commissioner regarding possible violations of the [Section 3-314] by third parties and the subsequent investigation by the Commissioner of Driver Partners' prior acquisitions of the Common Stock.

170. Absent a complete and accurate description of the "actions of the Corporation," including a complete and accurate description of "the Corporation's discussion with representatives of the Commissioner regarding possible violations of [Section 3-314] by third parties and the subsequent investigation by the Commissioner of Driver," this statement is false and misleading, particularly given First United's prior public statements—statements that both

42

disclaim "awareness and oversight" of First United's actions and contradict the clear evidence of the full extent of First United's actions.

171.    For example, in a letter to First United shareholders dated May 20, 2020, First United previously stated:

> First United did not instigate, direct or control the investigation into Driver's acquisition of the Company's shares, nor did any of First United's executives use their positions or relationships with trade associations to influence the investigation. Instead, at the urging of the Office of the Maryland Commissioner, First United requested that the Maryland Commissioner ensure that Driver's stock acquisitions were conducted properly, given that the acquisition of shares in a publicly traded financial institution without declaration of intent can violate certain change of control provisions. Subsequently, First United and its legal counsel responded promptly and fully to all requests from the Maryland Commissioner.

172.    Not only does the November 1, 2019 letter convey a clear request by First United to the Commissioner to begin an investigation ("We respectfully request that the Maryland Commissioner . . . immediately investigate this matter"), but the author of that letter later takes pains to try to hide the fact that First United "instigated" the investigation ("it is extremely important to FUNC that Driver not come away [from a meeting with representatives of the Maryland Commissioner] feeling like FUNC instigated your investigation").

173.    The Commissioner never "urged" First United to request an investigation (nor would such a request be necessary for the Commissioner to exercise authority he already possesses).

174.    Similarly, while First United now claims that the "Board is fully aware of and closely oversaw the actions of the Corporation," First United earlier took such offense at Driver's allegations of First United's involvement in the investigation as to call them "defamatory and baseless."

43

175. First United omits material facts necessary to make its discussion of the NASDAQ Voting Rights Rule Special Committee Proposal/Non-Binding Advisory Vote Regarding Rule 5640 of the NASDAQ Rules not misleading. If Defendants assert that "the Board is fully aware of and closely oversaw the actions of the Corporation" then they have an obligation to provide a complete and accurate description of those actions.

176. Defendants have retained in the Revised Proxy Statement the same false and misleading statements discussed above from their Preliminary Proxy Statement.

## CAUSE OF ACTION

### COUNT I – SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9
(Against All Defendants)

177. Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

178. SEC Rule 14a-9 prohibits the solicitation of proxies by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

179. As detailed above, Defendants repeatedly disseminated false and misleading statements in First United's Preliminary Proxy Statement during the campaign for board directors and shareholder-initiated resolutions, thereby misleading shareholders.

44

180. Several of these (and other) false and misleading statements persist in First United's Revised Proxy Statement, as detailed above, and the ones that were removed on March 26, 2021 were never revised, corrected, or recanted, so the false impressions resulting from them persist.

181. Defendants and/or their agents, including Bulgin, prepared, reviewed, approved and/or disseminated the Preliminary Proxy Statement and the Revised Proxy Statement containing false or misleading information.

182. Defendants and/or their agents, including Bulgin, knowingly, recklessly, or negligently filed the Preliminary Proxy Statement and the Revised Proxy Statement with these materially false and misleading statements.

183. In light of the false and misleading statements, shareholders are unable to make an informed choice when they cast their votes for board directors and shareholder initiatives.

184. The false or misleading statements were material in that a reasonable shareholder would have considered them important in deciding how to vote on the nominations for board directors. In addition, the willingness of the Defendants to repeatedly make false and misleading statements (or omit statements of material fact necessary to make statements not false or misleading) in express violation of Rule 14a-9 is a fact that a reasonable shareholder would have considered important in deciding how to cast its vote.

185. First United's false or misleading proxy statements are an essential link in causing shareholders to not vote for Driver's nominee for board director or for Driver's resolutions.

186. Defendants have therefore violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, both with respect to making multiple false and misleading statements or omissions, and with respect to failing to correct false and misleading statements or omissions made in earlier communications.

187.    Driver is entitled to injunctive relief and compensatory damages and to recover the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against all Defendants, jointly and severally, as follows:

A.      Finding Defendants violated Exchange Act § 14(a), 15 U.S.C. § 78n(a); SEC Rule 14a-9, 17 C.F.R. § 240.14a-9;

B.      Requiring Defendants to correct the March 1, 2021 Preliminary Proxy Statement and the March 26, 2021 Revised Proxy Statement prior to the shareholder vote on such date as it may be set;

C.      Awarding Plaintiff compensatory damages and the costs and disbursements of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees;

D.      Granting such other relief as the case may require or as this Court deems proper and equitable.

## JURY DEMANDED

Plaintiff demands a trial by jury on all triable issues.

Dated: March 26, 2021                Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:    *s/ Jason R. Scherr*
       Jason R. Scherr
       1111 Pennsylvania Avenue, NW
       Washington, DC 20004
       Telephone:   +1.202.739.3000
       Facsimile:   +1.202.739.3001
       Email:       jr.scherr@morganlewis.com

       *Counsel for Plaintiff Driver Opportunity*
       *Partners I LP*

46